## DANIEL JEX *v.* HUGH M. KEARY.

Individuals cannot, by their convention, derogate from the force of laws made for the preservation of public order or good morals.

But, in all cases in which it is not expressly and impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and it is not contrary to the public good. So, it does not forbid a defendant from submitting to the jurisdiction of a Court when it, really, possesses none. But he cannot elect another domicile for the purpose of being sued.

APPEAL from the Second District Court of New Orleans, *Bermudez,* J. C. *Roselius,* for defendant.

*A. N. Ogden and A. Pilot, for plaintiff and appellant.*—The defendant, duly cited, appeared and excepted to the jurisdiction of the Court, as follows : "On the ground that his domicile is in the parish of Avoyelles, and that he is not amenable to the jurisdiction of this Court; and he denies that the clause in the act of mortgage relied on by the plaintiff to sustain the jurisdiction of this Court has any legal and binding effect."

This exception was sustained by the Court.

It seems, indeed, that no argument should be needed in a case so plain, of such common occurrence, in presence of defendant's express renunciation to the very ground of defence now set up by him, and in a case based on a contract entered into before the passage of the law prohibiting the renunciation, by the debtor, to the law of the domicile. But the Judge of the inferior Court having dismissed plaintiff's action, it becomes his duty to point out the errors contained in the judgment which he seeks to reverse.

It is to be remarked that, on the day of trial, the counsel for defendant did not appear, and no written argument or memorandum of authorities was filed on his part, so that it is impossible for plaintiff's counsel to answer them, and he is placed under the necessity of arguing against the written opinion of the Judge, as the only document containing the grounds upon which the exception has been maintained.

The Court states the case exactly as it stands :

"Defendants plead to the jurisdiction of the Court, urging that his domicile is in the parish of Avoyelles, but he is met by the plaintiff with a waiver of such privilege in an authentic form."

The question to be decided upon such a statement is put by the Court in the following words : "Could such waiver have been consented at a time when no right of action against defendant had yet sprung into existence ? The Court thinks not."

In support of its opinion, the Court makes the following argument :

"The legal enactment requiring that a defendant be sued at the place of his domicile, or usual residence, C. P. 89, 162, has, for object, the preservation of public order and good morals; for, otherwise, this waiver could, in cases like that at bar, unremittingly be exacted from an embarrassed debtor, who would thus be made to deliver himself, feet and

6

hands bound, to an unmerciful creditor. For reasons alike, etc., etc.

"Indeed, the law considers that the right to be sued at one's domicile is abandoned only when cited before a Court whose jurisdiction does not extend to his residence, a defendant fails to decline to the jurisdiction of the tribunal, and pleads to the merits." C. P. 93.

· The substance of this argument is :

1. That the voluntary waiver of the jurisdiction of the debtor's domicile, before a suit is instituted, is contrary to public order and good morals.

2. That the failure to decline the jurisdiction, and the pleading to the merits, after the suit is instited, is not contrary to public order and good morals, and constitute the only case where the right to decline the jurisdiction can be abandoned.

We will have occasion to show, in the course of argument, that, instead of one case, there are numerous cases where the jurisdiction may be declined, or even changed by law, without injury to public order or good morals.

Before coming to the merits of the decision, it may be observed, en passant, that the Court's tender mercies towards the poor debtors of this community have rather gone too far in stating that, "in cases like that at bar, such waiver would unremittingly be exacted from embarrassed debtors who would thus be made to deliver themselves, feet and hands bound, to an unmerciful creditor." In the case at bar, the plaintiff is a third possessor of defendant's note, was not a party to the act of mortgage by which the defendant procured the money which he needed at the time, and, far from being an unmerciful creditor, he has waited fourteen months before suing the defendant. The reason relied upon in support of the judgment is more personal than legally true in principle, and, therefore, it can neither have a bearing in this case, nor constitute a solid basis to the opinion emitted by the Court that a waiver of jurisdiction is contrary to public order or good morals.

But, since the judgment exists, and is, no doubt, rendered in good faith, we must treat it with the respect it is entitled to. Let us, then, examine the general principles of law on matters of public order and good morals, and see how they are understood and explained by the jurisprudence of the country.

The law is obligatory upon all inhabitants of the State. C. C. Art. 9.

The law orders, it permits, it forbids. C. C. Art. 2.

No one can allege ignorance of the law. C. C. Art. 7.

From the rigid obligation imposed upon the inhabitants knowing the law and obeying its precepts, flows, as a natural consequence, the right to do what the law does not forbid. To what intent? That is the question.

For fear of abuse of that natural right to the prejudice of others, the law has prudently restricted it ; and, to that effect, has established the following rule, containing both the principle forbidding a derogation of

Daniel Jex v. Hugh M. Keary.

individuals from the force of certain laws, and the exception, when they may renounce the privilege established in their preference:

C. C. Art. 11. "Individuals cannot, by their convention, derogate from the force of laws made for the preservation of public order or good morals.

"But, in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not effect the rights of others, and it is not contrary to the public good."

To an inattentive reader it may certainly appear that the second paragraph of the article just quoted is simply an exception to the principles established by the first paragraph; but, upon a close examination, it will be seen that there is a very material difference between the terms employed to indicate what the law forbids, and those employed to indicate what the law permits.

The Article says, that no individual can derogate from laws made for the preservation of public order and good morals, but that he may renounce them, when his renunciation is not contrary to the public good.

The difference in the above terms fixes exactly the limit within which a person may renounce a right established in his favor by a law passed for the preservation of public order. He cannot disturb public order, nor oblige others to derogate from it, for his own convenience; but, if his own renunciation to that right which he is obliged to respect in others, is an act entirely personal in its results, on a mere matter of form, for example; if it has in it nothing by which any one may be made to suffer, nothing which can be considered as a precedent to exact from others their renunciation to the same right, nothing, in a word, contrary to the public good, he is welcome, as the law authorizes him to do, to renounce what it has established in his favor.

A law of public order may, as will be shown hereafter, establish certain rights, the abandonment of which, on the part of citizens, would violate certain sacred principles, sanctioned by universal legislation, independent of all force of action, or of all civil jurisdiction; and those rights must be maintained because they really constitute the public good. But there are laws of a different character, which may be called laws of public order, because they interest a whole community; laws, for example, regulating the exercise of individual rights between man and man, and which, to secure a safe administration of justice, have established a territorial circumscription, or, in other words, a civil jurisdiction, according to which, an inhabitant of the country is not bound to answer a suit instituted against him out of his domicile, a derogation from which laws cannot be interpreted as a breach of good morals or of public good. They constitute a privilege in favor of the individual; but if, notwithstanding that privilege, he consents, or wishes, perhaps, to have his case tried before another Judge, how can the public good be put in jeopardy by a mere change of tribunal. When the forms of justice are observed,

and the law is applied to the case according to its merits, it matters not in what place the judgment is rendered, provided it be with the consent of the party interested. Such a renunciation, in his part, cannot reach nor injure the principles of public order, which the law has in view, in stating that no one shall be permitted to violate them.

Although, in the cases decided by our Courts in the matter, the Judges have not insisted on that difference in terms of the law which we have mentioned above; yet, it may be seen that they have clearly perceived and appreciated the cases where the public good may be injured by the conventions of parties, either in examining those which are submitted to them, or in supposing some analogous ones to elucidate the matter; and their appreciation of a renunciation in such cases proves that there are occasions where a derogation from the law cannot be sanctioned, for reasons which could not be invoked in a case of a mere renunciation to jurisdiction.

When a derogation from a law of public order is contrary to the public good, a question of moral sense, or of good morals, to use the words of the law, is always at stake; whilst, in a derogation of a law of public order, which cannot interfere with the principles of good morals or the rights of third parties, the public good cannot suffer.

Such is our interpretation of the law; let us see whether it accords with our jurisprudence.

In the case of *Vaughan* v. *Christian et als*, 3 An. 329, the Court commenting upon Art. 11 of the Civil Code, above quoted, says:

"The distinction which exists in relation to absolute nullities is broad and easily defined. If the contract is tainted with a nullity resting on motives of public order, or having its origin in the respect due to good morals; if it be one of the conventions prohibited by Art. 11 of the Code, it is an absolute nullity, to which the law perpetually resists; it is not susceptible of ratification, and the prescription of five years is inapplicable to it. A contract by the father or the husband to surrender the parental or the marital power; an obligation to pay money for the commission of a crime, or for doing an immoral act, the partition of a succession made before the succession is open, are instances of such conventions."

The Court, to support its decision, does not speak of the difference in the terms of the article, but it looks into its true spirit; and it makes such a lucid exposition of the convention prohibited by a law of public order that it is impossible to mistake the intention of the law. It is evident that, in all the cases of absolute nullity above mentioned, the conventions are contrary to good morals, and, therefore, to the public good. But can any analogy exist, or be even imagined, between a renunciation to jurisdiction, which changes only the place where the judgment is to be rendered, by the consent of the only person interested in the matter, without impairing the rights of the parties, with a convention to pay money for the commission of a crime, or for the abandonment

of the paternal or marital power? The difference between these supposed cases needs no demonstration, and characterizes the difference made by the Court, in the above decision, and in the decisions to be quoted hereafter, between the laws which cannot be derogated from, because they are passed for the express maintenance of good morals and of public good, and the laws which may be derogated from, because, although they regulate matters of public order (as far as jurisdiction is concerned, for example), and guarantee certain privileges to individuals, the renunciation to such privileges cannot constitute an outrage to good morals or to the public good.

If such a renunciation could be considered as an outrage to the public good, the Article 93 of the Code of Practice would have been repealed long ago or declared unconstitutional by our Supreme Court; and yet they do nothing but sanction the very principle that we are contending for. According to Article 92, when a Court is without jurisdiction on account of the nature of the case, ratione materiæ, the parties cannot make it competent; there we find a principle of public order, without reference to persons. But, says Article 93, " i a person, cited before a Judge out of his domicile, appears and answers to the merits, instead of declining the jurisdiction, the judgment against him shall be valid

Can it be seriously presented that the law considers a renunciation to jurisdiction, on the part of a man fully cognizant of his rights, as an outrage to public order and good morals, and permits at the same time that a poor ignorant man shall be deprived of the same right, which he could not renounce if he wished, by the mere fact that he has not filed an answer in Court, or that he has not, in his answer, declined the jurisdiction of the tribunal? If he did not know that he could decline the jurisdiction, he ought to be entitled to a greater protection than the shrewd and well-informed debtor. If, knowing his rights, he consents to the jurisdiction, why not permit him to regulate and fix the matter beforehand as well as after the proceedings are commenced.

The fact is that our tribunals have never considered the renunciation to jurisdiction as outrageous to public order or good morals, but have, on the contrary, acknowledged its validity.

In the case of *Dupuy* v. *Griffon's Executor* (1. N. S. 198) the Court says: "When want of jurisdiction relates to personal rights or privileges of the defendant, it may be cured by consent." Again, in the case of *Fleming* v. *Hiligsberg:* "The consent of parties cannot give jurisdiction when wanting ratione materiæ; it can only confer it where mere personal rights are involved, or where the defendant answers to a suit instituted out of his domicile."

The Supreme Court is evidently of a different opinion from the Judge of the Second District Court; and instead of limiting to a single instance the abandonment of one's domicile, places the voluntary renunciation on the same footing with the filing of an answer to a suit instituted out of defendant's domicile.

The French Code, Art. 3, expressly permits the renunciation to jurisdiction. If the question be put why the framers of our Code have not copied that article as they have copied so many others, the answer is easy and conclusive in favor of plaintiff. Art. 6, of the French Code, is the first paragraph of Art. 11 of our Code, which says that individuals cannot, by their conventions, derogate from the force of laws made for the preservation of public order or good morals, and the framers of our Code, instead of copying the Art. 3, of the French Code, granting the special rights of renouncing to our jurisdiction, have inserted the general clause which is not to be found in the French Code, and by virtue of which one may renounce to all privileges established in his favor, when that renunciation is not contrary to the public good.

On this question the French commentators speak as follows :

French Pandects: "With respect to laws concerning individual rights, every one may renounce to a right established in his favor."

"Laws of public order are easily distinguished from laws relative to private rights. All laws which interest the whole society, taken collectively, are of public right ; those concerning private interest are of private right."

Motives of the Legislative Body, 2d March, 1803: "The framers of the Code have thought proper to permit renunciation to jurisdiction ; because, in so doing, the law only lends its force to the will of the parties, which is perfectly lawful and reasonable."

Rogron, Code Civil Explique : "Parties may renounce to that right because such a renunciation has nothing contrary to public order."

We have, perhaps, said more on this subject then was necessary, and we now come to the second ground relied upon by the Judge to dismiss plaintiff's action, which we do not consider any more warranted by law than the first one. The decision says :

"The better to secure the exercise of such privileges it has pleased the Legislature, and wisely, too, by a late statute, to forbid the renunciation to such a right before it becomes acquired, and this law was in force at the filing of the plea. (Acts of 1861, p. 137.)

The waiver in question having been made in contravention of law, the defendant is welcome in repudiating the exaction."

The statute quoted by the Court is the one amending Art. 162 of the Code of Practice. The amendment consists in adding, after the words "It is a general rule in civil matters that one must be sued before the Judge having jurisdiction over the place where he has his domicile or residence" the following words: "and that it shall not be permitted to elect any other domicile or residence for the purpose of being sued."

To the argument of the Judge we simply answer: that the application of this amendment of the Code of Practice to a contract passed in 1856, could not give to the law a retrospective effect.

The law provides for the future. It says that a person shall not be permitted to elect another domicile. It implies thereby, and in fact

acknowledges, that such a right existed before. If so, the Statute of 1861 cannot deprive a person of a right acquired under a previous law.

It is the same principle applicable to contracts allowing interest at the rate of 10 per cent. before the passage of the law reducing conventional interest to 8 per cent. Such contracts are daily enforced in our country.

Notwithstanding five years have elapsed between the waiver of jurisdiction in this case and the statute of 1861, yet the decision says: "The waiver in question having been made in contravention of law;" what law? certainly not the law of 1861, which was not in existence. It must then be the Article 2 of the Civil Code; but then, what connection can there exist between that article and the statute of 1861 amending the Article of the Code of Practice relative to jurisdiction.

It is impossible to understand the Judge's application of the statute of 1861 to the present case, otherwise than by supposing that he considered that statute as merely explanatory of the law as it stood previously, to wit: the principle contained in Art. 2 of the Civil Code, by which all privileges could be renounced when the renunciation was not contrary to public order or good morals, which he considers as outraged in this case. At all events, as the plaintiff is met by the Court with the statute of 1861, let us, in the darkness which surrounds us, determine what is the characteristic of an ex post facto law in opposition to an explanatory law.

Merlin, verbo Effet Rétroactif, Sect. 3, §1, No. 1, says: "In order to give to a statute the character of a retrospective law, two conditions are necessary: 1. It must apply to what existed in the past, and change it. 2. It must do so to the prejudice of those affected by its dispositions."

It is easy to ascertain, by the application of the two conditions required by Merlin, to the statute of 1861, whether that law has a retrospective effect, or not.

In the case at bar, for example, it is evident that, according to our laws and jurisprudence, 1. We had the right to renounce the privilege of jurisdiction established in our favor: the statute of 1861 repeals that right in express terms; 2. It repeals that right to the prejudice of the plaintiff, who is met by the prohibition of the statute, when he wishes to exercise the rights conceded to him by a contract perfectly legal according to the laws in existence when it passed.

It may sometimes be difficult to distinguish between a new law and a law explanatory of a former one; but when the law lately passed has, in its application to a stated case, all the characteristics of a retrospective law, that is, when it changes the situation of the parties and destroys their vested rights, then no doubt can exist. Should even the Legislature give to a retrospective law the title of an explanatory one, such a statute could not be held valid, because the Legislature could not be permitted to do indirectly* what it cannot do directly. If therefore we admit, for the sake of argument, that it was the intention of the Legislature, or that the legal consequence of the statute is to explain the true

intent of Art. 2 of the Civil Code, our answer to such a plea is that the statute of 1861 is, under that view, unconstitutional.

Article 115 of the Constitution of the State of Louisiana says: "Every law enacted by the Legislature shall embrace but one object, and that shall be expressed in its title."

1. The law shall have but one object.

The statute of 1861, if construed in favor of the defendant, would have two objects: first, that of amending Art. 162 of the Code of Practice, which cannot be denied, since the title itself says so; secondly, that of explaining Art. 2 of the Civil Code, of which the title says nothing, and the application to which is the only mode of explaining, as we had said, the opinion of the Judge that the renunciation, in this case, is contrary to public order and good morals.

2. The object of the law shall be expressed in its title.

If the Legislature had entitled the statute "An Act to explain Art. 2 of the Civil Code, and to amend Art. 162 of the Code of Practice," it would be unconstitutional. *State* v. *Harrison,* 11 A. 722. The silence of the Legislature on any other object but that mentioned in the title of the statute, cannot authorize the Court to adopt a construction contrary to the Constitution.

The defendant, therefore, cannot argue of any other object of the law, but that mentioned in its title; for if the Court was to extend its application to an explanation of the eleventh article of the Civil Code, it would, by so doing, pronounce its unconstitutionality.

Nothing can give to the statute of 1861 the character of an explanatory law. Its bearing is limited to future transactions, and its dispositions cannot be invoked to deprive the plaintiff, in this case, of his vested right to prosecute his claim before the Second District Court of New Orleans. It is therefore prayed, that the judgment appealed from be reversed, and the case remanded for further proceedings.

LABAUVE, J. The two notes sued upon were executed by the defendant, a resident of the parish of Avoyelles, on the 18th day of November, 1856, payable, respectively, on the 12th and 15th November, 1860. This suit was filed and instituted on the 5th August, 1861, before the Second District Court of New Orleans, when the defendant was still residing in the said parish of Avoyelles. In order to secure the payment of said promissory notes, and others executed on the same day, to the amount of $75,000, the defendant consented and gave a special mortgage by public act, before a notary public, in New Orleans, on a plantation and slaves, situated in the parish of Rapides. It was stipulated in the act of mortgage that, if it become necessary to institute legal proceedings for the recovery of the amount of said notes, or of any part of them, the defendant agreed that such legal proceedings might be instituted and carried to final judgment and execution in any of the District Courts of New Orleans, or other Courts of competent jurisdiction in said city, waiving and renouncing the

benefit of any and all laws providing that defendants can only be sued or proceeded against before the Judge of the Parish or District wherein they reside or have their domicile. By the act of 1861, p. 137, the Article 162, C. P., requiring that defendants must be sued before their own Judge, was amended by adding the following words : *" and that it shall not be permitted to elect any other domicile or residence for the purpose of being sued."*

The defendant excepted to the jurisdiction of the Court as follows :

"The defendant, Hugh M. Keary, now appears for the purpose of excepting to the jurisdiction of this Court, and excepts on the ground that his domicile is in the Parish of Avoyelles, and that he is not amenable to the jurisdiction of this Court, and he denies that the clause in the act of mortgage relied on by the plaintiff to sustain the jurisdiction of this Court, has any legal or binding effect."

The District Court sustained the exception, and dismissed the suit as prayed for.

The plaintiff took this appeal.

The motive of this amendment is very clear to our mind ; it was enacted to prevent the improper exercise of undue influence and advantage by money-lenders upon the needy, and to prevent also the obligor from waiving his domicile in advance, and at the time of the contracting of the obligation ; and the only effect of this law is to reserve to the debtor his rights of pleading to the jurisdiction of the Court, notwithstanding any agreement to the contrary, but it does not forbid him from submitting to the jurisdiction of the Court, if he chose, by appearing and answering on the merits. C. P., Art. 93. Previous to this amendment, it was always considered that a party in contracting a debt, could agree to waive his domicile, and submit to the jurisdiction of another competent Court than that of his residence.

This article, 162 of the Code of Practice, cannot be considered as a law of public order, or good morals, but as one of convenience; enacted for a limited class of individuals, and which does not concern the public. Individuals cannot, by their convention, derogate from the force of laws made for the preservation of public order or good morals.

But in all cases in which it is not expressly and impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and it is not contrary to the public good. C. C. Art. 11.

The very enactment of this amendment to Art. 162, C. P., is a strong argument, going to demonstrate that previous to its passage, parties could waive their domicile by agreement; now any such waiver is prohibited and not binding. It is the agreement that is prohibited, and nothing more. We believe then that the agreement by which the defendant consented to waive his domicile or residence, was legal and binding on him at the time he contracted the obligation, and the legisla-

tive act passed subsequently, would not affect the rights of the suing creditor.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be annulled and reversed ; that the exception to the jurisdiction of the Court be overruled, and that the case be remanded to be proceeded in according to law, and that the defendant and appellee pay the cost of this appeal.